## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

Ward Cater, on behalf of
himself and all others similarly situated,

Court File No._____

Plaintiff,

v.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

Samsung Electronics Co., Ltd.; Samsung
Semiconductor, Inc.; Hynix Semiconductor,
Inc.; Hynix Semiconductor America, Inc.;
Micron Technology, Inc.; Micron Semiconductor
Products, Inc.; NEC Electronics America, Inc.;
Cypress Semiconductor, Inc.; Alliance
Semiconductor Corporation; Fujitsu Ltd.;
Fujitsu America, Inc.; Hitachi Ltd.; Hitachi
America Ltd.; Mitsubishi Electric Corporation;
Mitsubishi Electric & Electronics USA, Inc.;
Renesas Technology Corporation; Renesas
Technology America, Inc.; Sony Corporation; Sony
Corporation of America; Sony Electronics, Inc.;
Toshiba Corporation; Toshiba America Corporation;
Toshiba America Electronic Components, Inc.,

Defendants.

---

Plaintiff, by his attorneys, brings this civil action for damages on behalf of himself

and on behalf of all others similarly situated in North Dakota.  For his Complaint against

Defendants, Plaintiff, upon personal knowledge as to his own acts and status, and upon

information and belief as to all other matters, alleges the following:

### INTRODUCTION

1.      Plaintiff brings this class action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under North Dakota Code § 51-08.1-01 *et seq*., and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

2.      This case arises out of a long-running nationwide conspiracy beginning no later than January 1, 1998 and continuing through the present ("Class Period"), among all Defendants and their co-conspirators with the purpose and effect of fixing prices, allocating market shares, eliminating and suppressing competition, and committing other unlawful practices designed to inflate and stabilize the prices of Static Random Access Memory ("SRAM").

3.      As used herein, the term "Static Random Access Memory" ("SRAM") includes all types of static random access memory sold during the Class Period, including, without limitation, high speed SRAM, low-powered SRAM, synchronous SRAM (including both Late Write and DDR synchronous SRAM), asynchronous SRAM (including asynchronous fast SRAM), pseudo SRAM (also known as "PSRAM" or "mobile PSRAM"), DDR SRAM, CellularRAM, and slow SRAM.  For purposes of this complaint, SRAM is defined to exclude all types of dynamic random access memory ("DRAM") sold during the Class Period, including synchronous DRAM ("SDRAM").

6741

4.      SRAM is a type of memory that is faster and more reliable than DRAM. The term "static" is derived from the fact that SRAM does not need to be refreshed like DRAM.  Whereas DRAM supports access times of about 60 nanoseconds, SRAM can support access times as low as 10 nanoseconds.  Additionally, the cycle time of SRAM is much shorter than that of DRAM because it does not need to pause between accesses.

5.      SRAM is used for a variety of applications including routers, hubs and switches in Local Area Networks ("LANs"), Wireless Area Networks ("WANs") and other computing equipment.

6.      SRAM is also used as Level 1, 2, or 3 cache on the motherboards of computers, including servers.  It is used in cellular telephones and other handheld devices, including Blackberries and other PDAs, Nintendo GameCubes and iPods.

7.       According to iSuppli Corporation data, use of SRAM for mobile communications applications increased from 30.6% in 2000 to 44% in 2002.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337.  The Court has jurisdiction over the North Dakota state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  The Court also has jurisdiction over the North Dakota state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

6741

9.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

10.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

   a.   Defendants and their co-conspirators participated in a continuous and uninterrupted flow in interstate commerce to customers located in North Dakota;

   b.   Defendants and their co-conspirators sold and shipped substantial quantities of SRAM to customers located in North Dakota;

   c.   Data, information, correspondence and financial material were exchanged between customers located in North Dakota and the Defendants and their co-conspirators; and/or

   d.   Money flowed between banks in North Dakota and the Defendants and their co-conspirators.

11.     The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority, including each other as co-conspirators) have:

   a.   Transacted business in North Dakota;

   b.   Contracted to supply or obtain services or goods in North Dakota;

   c.   Intentionally availed themselves of the benefits of doing business in North Dakota;

   d.   Produced, promoted, sold, marketed or distributed their products or services in North Dakota and, thereby, have purposefully profited from their access to the markets in North Dakota;

e.   Caused tortious damage by act or omission in North Dakota;

f.   Caused tortious damage in North Dakota by acts or omissions committed outside such jurisdictions while (i) regularly doing or soliciting business in such jurisdictions, and/or (ii) engaging in other persistent courses of conduct within such jurisdictions and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdictions; and

g.   Committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in North Dakota to Plaintiff and members of the Class while (i) regularly doing or soliciting business in such jurisdictions, and/or (ii) engaging in other persistent courses of conduct within such jurisdictions and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdictions.

12.   The Defendants otherwise had the requisite minimum contacts with North Dakota, such that, under the circumstances, it is fair and reasonable to require the Defendants to come to this Court to defend this action.

## THE PARTIES

### Plaintiff

13.   Plaintiff Ward Cater, a resident of Fargo, North Dakota, indirectly purchased SRAM from one or more of the Defendants during the Class Period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

### Defendants

14.   Defendant Samsung Electronics Co. Ltd. is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Main Building 250-2 ga, Taepyung-ro Chung-gu, Seoul, Korea.  During the time period covered by this Complaint, Defendant Samsung Electronics Co. Ltd. manufactured, sold

and distributed SRAM to customers throughout the United States.

15.     Defendant Samsung Semiconductor, Inc. is a wholly owned and controlled subsidiary of Defendant Samsung Electronics Co. Ltd. with its principal place of business at 3655 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Samsung Semiconductor, Inc. sold and distributed SRAM to customers throughout the United States.  Samsung Electronics Co. Ltd., and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."

16.     Defendant Hynix Semiconductor, Inc. is a business entity organized under the laws of South Korea, with its principal place of business at SAN 136-1, Ami-Ri Bubal-eub, Ichon-si, Kyongki-do, Korea.  During the time period covered by this Complaint, Defendant Hynix Semiconductor, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.

17.     Defendant Hynix Semiconductor America, Inc. is a wholly owned and controlled subsidiary of Defendant Hynix Semiconductor, Inc. with its principal place of business at 3101 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Hynix Semiconductor America, Inc. sold and distributed SRAM to customers throughout the United States.  Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. are referred to collectively herein as "Hynix."

18.     Defendant Micron Technology, Inc. is a Delaware Corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho.  During the time period covered by this Complaint, Defendant Micron Technology, Inc. manufactured, sold and distributed SRAM throughout the United States.

19.     Defendant Micron Semiconductor Products, Inc. is a wholly owned and controlled subsidiary of defendant Micron Technology, Inc. with its principal place of business at 8000 South Federal Way, Boise, Idaho.  During the time period covered by this Complaint, Defendant Micron Semiconductor Products, Inc. sold and distributed SRAM to customers throughout the United States.  Micron Technology, Inc. and Micron Semiconductor Products, Inc. are referred to collectively herein as "Micron."

20.     Defendant NEC Electronics America, Inc. ("NEC") is a wholly owned and controlled subsidiary of NEC Electronics Corporation, with its principal place of business at 2880 Scott Boulevard, Santa Clara, California and its manufacturing plant in Roseville, California.  During the time period covered by this Complaint, Defendant NEC sold and distributed DRAM to customers throughout the United States.

21.     Defendant Cypress Semiconductor, Inc. ("Cypress") is a business entity organized under the laws of California, with its principal place of business at 3939 North First Street, San Jose, California.  During the time period covered by this Complaint, Defendant Cypress Semiconductor, Inc. sold and distributed SRAM to customers throughout the United States.

22.     Defendant Alliance Semiconductor Corporation ("Alliance") is a business entity organized under the laws of Delaware, with its principal place of business at 2575 Augustine Drive, Santa Clara, California.  During the time period covered by this Complaint, Defendant Alliance Semiconductor Corporation sold and distributed SRAM to customers throughout the United States.

23.     Defendant Fujitsu Ltd. is a business entity organized under the laws of

Japan with its principal place of business Shiodome City Center 1-5-2 Higashi-Shimbashi, Minato-ku, Tokyo 105-7123, Japan.  During the time period covered by this Complaint, Defendant Fujitsu Ltd. sold and distributed SRAM to customers throughout the United States.

24.     Defendant Fujitsu America, Inc., is a wholly owned and controlled subsidiary of Defendant Fujitsu Ltd.  Fujitsu Ltd. is a business entity organized under the laws of California, with its principal place of business at 1250 Arques Ave., M/S 124 Sunnyvale, California.  During the time period covered by this Complaint, Defendant Fujitsu America, Inc. sold and distributed SRAM to customers throughout the United States.  Fujitsu Ltd. and Fujitsu America, Inc. are referred to collectively herein as "Fujitsu."

25.     Defendant Hitachi Ltd. is a business entity organized under the laws of Japan, with its principle place of business at 6-1 Marunouchi Center Building 13F Chiyoda-ku,Tokyo, 100-8220, Japan.  In April of 2003 of the semiconductor divisions of Hitachi Ltd. and Mitsubishi combined to form Defendant Renesas Technology Corporation.  During the time period covered by this Complaint, Defendant Hitachi Ltd. sold and distributed SRAM to customers throughout the United States

26.     Defendant Hitachi America Ltd. is a wholly owned and controlled subsidiary of Defendant Hitachi Ltd.  Hitachi America Ltd. is a business entity organized under the laws of New York, with its principal place of business at 50 Prospect Avenue, Tarrytown, New York.  During the time period covered by this Complaint, Defendant Hitachi America Ltd. sold and distributed SRAM to customers throughout the United

6741

States.  Hitachi Ltd. and Hitachi America Ltd. are referred to collectively herein as "Hitachi."

27.     Defendant Mitsubishi Electric Corporation is a business entity organized under the laws of Japan, with its principal place of business at Tokyo Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  In April of 2003 of the semiconductor divisions of Hitachi Ltd. and Mitsubishi combined to form Defendant Renesas Technology Corporation.  During the time period covered by this Complaint, Defendant Mitsubishi Electric Corporation, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.

28.     Defendant Mitsubishi Electric & Electronics USA, Inc. is a wholly owned and controlled subsidiary of defendant Mitsubishi Electric Corporation.  Defendant Mitsubishi Electric & Electronics USA, Inc. is a business entity organized under the laws of Delaware, with its principal place of business at 500 Corporate Woods Parkway, Vernon Hills, IL 60061.  During the time period covered by this Complaint, Defendant Mitsubishi Electric & Electronics USA, Inc. manufactured, sold and distributed SRAM to customers throughout the United States.  Mitsubishi Electric Corporation and Mitsubishi Electric & Electronics USA, Inc. are referred to collectively herein as "Mitsubishi."

29.     Defendant Renesas Technology Corporation is a business entity organized under the laws of Japan with its principal place of business at Marunouchi Building, 4-1, Marunouchi 2-chome, Chiyoda-ku Tokyo 100-6334, Japan.  During the time period covered by this Complaint, Defendant Renesas Technology Corporation sold and distributed SRAM to customers throughout the United States.

6741                                          9

30.     Defendant Renesas Technology America, Inc. is a wholly owned and controlled subsidiary of Renesas Technology Corporation with its principal place of business at 450 Holger Way, San Jose, California.  During the time period covered by this Complaint, Defendant Renesas Technology America, Inc. sold and distributed SRAM to customers throughout the United States.  Defendants Renesas Technology Corporation and Renesas Technology America, Inc. are referred to collectively herein as "Renesas."

31.     Defendant Sony Corporation is a business entity organized under the laws of Japan, with its principal place of business at 6-7-35 Kitashinagawa, Shinagawa-ku, Tokyo 141-0001, Japan.  During the time period covered by this Complaint, Sony Corporation sold and distributed SRAM to customers throughout the United States.

32.     Defendant Sony Corporation of America is a wholly owned and controlled subsidiary of Sony Corporation, with its principal place of business at 550 Madison Avenue, 27th Floor, New York, New York.  During the time period covered by this Complaint, Sony Corporation of America sold and distributed SRAM to customers throughout the United States.

33.     Defendant Sony Electronics, Inc. is a wholly owned and controlled subsidiary of Sony Corporation, with its principal place of business located at 12450 W. Bernardo St., San Diego, CA 92127.  During the time period covered by this Complaint, Sony Electronics, Inc. sold and distributed SRAM to customers throughout the United States.  Sony Corporation, Sony Corporation of America, and Sony Electronics, Inc. are referred to collectively herein as "Sony."

6741

34.     Defendant Toshiba Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  During the time period covered by this Complaint, Defendant Toshiba Corporation manufactured, sold and distributed SRAM to customers throughout the United States.

35.     Defendant Toshiba America Corporation is a wholly owned and controlled subsidiary of Toshiba Corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, New York.  During the time period covered by this Complaint, Defendant Toshiba America Corporation manufactured, sold and distributed SRAM to customers throughout the United States.

36.     Defendant Toshiba America Electronic Components, Inc. is a wholly owned and controlled subsidiary of Toshiba Corporation with its principal place of business located at 19900 MacArthur Boulevard Suite 400, Irvine, CA 92612.  During the time covered by this Complaint, Defendant Toshiba America Electronic Components, Inc. sold and distributed SRAM to customers throughout the United States.  Toshiba Corporation, Toshiba America Corporation, and Toshiba America Electronic Components, Inc. are referred to collectively herein as "Toshiba."

**Co-Conspirators**

37.     Various others, presently unknown to Plaintiff, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

38.     The acts charged in this Complaint have been done by Defendants and their

co-conspirators, or were authorized, ordered or done by their respective officers, agents,

employees or representatives while actively engaged in the management of each

Defendant's business or affairs.

39.     Each of the Defendants named herein acted as the agent or joint venturer of

or for the other Defendants with respect to the acts, violations and common course of

conduct alleged herein.  Each Defendant which is a subsidiary of a foreign parent acts as

the sole United States agent for SRAM made by its parent company.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this suit as a class action pursuant Rules 23(b)(2) and

23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Plaintiff

Class ("the Class") composed of and defined as follows:

> All persons and entities residing in North Dakota who, from January 1,
> 1998 through the present, purchased SRAM in North Dakota indirectly
> from the Defendants for their own use and not for resale.  Specifically
> excluded from this Class are the Defendants; the officers, directors or
> employees of any Defendant; any entity in which any Defendant has a
> controlling interest; and any affiliate, legal representative, heir or assign of
> any Defendant.  Also excluded are any federal, state or local governmental
> entities

41.     Plaintiff does not presently possess information identifying the exact size of

the Class.  Based upon the nature of the trade and commerce involved, Plaintiff believes

the total number of class members is sufficiently numerous such that joinder of all Class

members would be impracticable.

42.     Numerous questions of law or fact arise from Defendants' anticompetitive

conduct are common to the class.  Among the questions of law or fact common to the

6741                                    12

class are:

    a.    Whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for, SRAM sold in North Dakota;

    b.    Whether the conduct of Defendants caused prices of SRAM sold in North Dakota to be artificially inflated to non-competitive levels; and

    c.    Whether Plaintiff and other members of the class were injured by the conduct of Defendants and, if so, the appropriate class-wide measure of damages.

43.    These common questions of law or fact are common to the class, and predominate over any other questions affecting only individual class members.

44.    Plaintiff in this proposed class action asserts claims typical of those of the individual members of the proposed Class. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

45.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has no interests antagonistic to the Class. Plaintiff has suffered the same harm as the members of the Class and has, and will continue to, zealously pursue claims against Defendants. Plaintiff has retained counsel competent and experienced in the prosecution of complex class actions, and in particular, counsel has broad experience in complex antitrust litigation similar in size, scope, and complexity to the present case.

46.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual

prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Moreover, even if the Class members themselves could afford such individual litigation, the judicial system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the judicial system due to the complex legal and factual issues presented by this case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

47.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## NATURE OF TRADE AND COMMERCE

48.     Throughout the period of time covered by this Complaint, Defendants and their co-conspirators engaged in the business of marketing and selling SRAM throughout North Dakota and the United States. During each year of the Class Period, total sales of SRAM were in the billions of dollars.

49.     The market for the manufacture and sale of SRAM is conducive to the type of collusive activity alleged here. That market is oligopolistic in nature, with Samsung as the clear market leader. According to the 2004 "Memory Market Backgrounder" available at Samsung's website, the shares of the leading SRAM manufacturers in 2003 were as follows:

| | |
|---|---|
| Samsung | 32.5% |
| Renesas | 15.0% |
| Cypress | 11.6% |
| Toshiba | 7.9% |
| NEC | 7.2% |
| Hynix | 3.7% |
| Sony | 4.1% |

50.     According to Samsung's 2006 "Memory Market Overview," also available at its website, the shares of the top SRAM manufacturers in 2004 and 2005 were as follows:

| | 2004 | 2005 |
|---|---|---|
| Samsung | 34% | 29% |
| Micron | 4% | 15% |
| NEC | 11% | 10% |
| Renesas | 6% | 5% |
| Toshiba | 6% | 5% |

51.     Samsung notes in this same document that it holds 30% of the pseudo-SRAM market and that this segment is forecasted to grow by 33% annually through 2008.

52.     The market for the manufacture and sale of SRAM is subject to high manufacturing and technological barriers to entry.  Efficient fabrication plants are large and costly.  SRAM is also subject to technological advances and firms within the industry

must undertake significant research and development expenses.

53.     As a means to further secure their respective positions within the SRAM marketplace, Samsung, Cypress, NEC, Renesas and Integrated Device Technology (IDT) maintain membership in the Quad Data Rate (QDR) Consortium.  By was of this consortium, participating companies cooperate in the development of the networking SRAMs.  The QDR Consortium dates back at least as far as 1999.

54.     The SRAM industry has also been subject to significant consolidation during the Class Period. This trend is exemplified by the IDT's acquisition of Integrated Circuit Systems, Inc. ("ICSI") in June of 2005.  It is further exemplified by the merger in April of 2003 of the semiconductor divisions of Hitachi Ltd. and Mitsubishi.  The resultant entity, Renesas is one of the leading manufacturers of SRAM.

55.     Beginning in 1998 and continuing through much of 2001, SRAM prices rose, due in significant part to the effects of the industry-wide collusion now being investigated by the DOJ.  During 2000 alone, the average selling price of SRAM in the United States increased by an extraordinary 33%.  While SRAM prices declined somewhat during parts of 2001 and 2002, the cartel created by Defendants operated to mitigate against those declines so that prices were still at supracompetitive levels.  As SRAM prices increased again in 2003 and subsequent years, the collusive activity among the Defendants maintained those prices at supracompetitive levels.

## DEFENDANTS' ILLEGAL CONDUCT

56.     On information and belief, in October of 2006, the Antitrust Division of the United States Department of Justice ("DOJ") sent out subpoenas to at least nine

companies in connection with an investigation of cartel activity in the SRAM industry. Those companies are: Samsung, Mitsubishi, Toshiba, Micron, Cypress, Sony, NEC, Renesas and Hitachi.

57.    A DOJ spokesperson was quoted as saying: "[t]he U.S. Department of Justice's antitrust division is conducting an investigation regarding anti-competitive practices against chief SRAM manufacturers."  Several of these companies being investigated--Hynix and Samsung--have already pled guilty to price-fixing in the DRAM industry and have paid substantial fines to the DOJ for those unlawful activities ($300 million for Samsung and $185 million for Hynix).  Elpida Memory, Inc., a DRAM manufacturer created by way of a joint venture between Hitachi and NEC, two of the Defendants here, was fined $84 million. Micron, another major SRAM manufacturer, was the amnesty applicant in the DRAM price-fixing investigation.  Mitsubishi announced on October 16, 2006 that the Department of Justice is investigating its activities in the DRAM market.

58.    Several SRAM manufacturers--including Defendants Samsung, Mitsubishi, Toshiba, Micron, Cypress, Sony, NEC, Renesas and Hitachi--have publicly acknowledged the DOJ investigation and claim to be cooperating with it.  Toshiba referred in a press release dated October 17, 2006 to the fact that the DOJ appeared to be conducting an "industry-wide investigation."  A spokesperson for Cypress has been quoted as saying that "DOJ is looking at the market and the practices involved."  A Micron spokesperson effectively conceded that it was a target of the DOJ investigation, albeit not the "main target."

59.     During the period from 1994 to 1997 (the period preceding the Class Period), SRAM prices in the United States sharply declined and the industry fell from profitability into steep losses.  In 1997, Micron commenced an antidumping proceeding before the Court of International Trade with respect to SRAM imports from Korea and Taiwan.  Those proceedings were not resolved in Micron's favor.  However, these antidumping proceedings were a factor that favored collusion.  Antidumping cases encourage both importers and domestic producers to raise prices—the former to avoid further antidumping claims and the latter to establish a high base price against which to evaluate their future antidumping claims against importers.  The DRAM price-fixing conspiracy prosecuted by the DOJ also took place in a period following antidumping claims brought by Micron.

60.     Beginning in 1998 and continuing through much of 2001, SRAM prices rose, due in significant part to the effects of the industry wide collusion now being investigated by the DOJ.  During 2000 alone, the average selling price ("ASP") of SRAM in the United States increased by 33%--from an ASP of $3.93 in 1999 to approximately $5.24 in 2000.  By comparison, the ASP of SRAM in 1995-97 had dropped from $5.55 to $3.64. To the extent that SRAM prices declined somewhat during part of 2001 and in part of 2002, the cartel created by Defendants and their co-conspirators operated to mitigate those declines so that prices were still at supracompetitive levels.  Indeed, SRAM prices experienced an upturn for part of 2002.  As SRAM prices increased again in 2003 and subsequent years, the collusive activity among the Defendants and their co-conspirators kept those prices at supracompetitive levels.

61.    Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to raise the prices at which they sold SRAM to artificially inflated levels.

62.    Defendants, through their officers, directors and employees, effectuated the aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

      a.    Participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of SRAM in the United States;

      b.    Agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of SRAM sold in the United States;

      c.    Issuing price announcements and quotations in accordance with the agreements reached; and

      d.    Selling SRAM to various customers in the United States at non-competitive prices.

## ACTIVE CONCEALMENT

63.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.  Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases.  Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid

detection.  Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

64.     As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

65.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

66.     Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1998 and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for SRAM in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

67.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.   To fix, raise, maintain and stabilize the price of SRAM;

b.   To allocate markets for SRAM among themselves;

c.   To submit rigged bids for the award and performance of certain SRAM contracts; and

d.   To allocate among themselves the production of SRAM.

68.   The combination and conspiracy alleged herein has had the following effects, among others:

a.   Price competition in the sale of SRAM has been restrained, suppressed, and/or eliminated in the United States;

b.   Prices for SRAM sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.   Those who purchased SRAM directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

69.   Plaintiff has been injured and will continue to be injured in its business and property by paying more for SRAM purchased indirectly from the Defendants and their co-conspirators than it would have paid and will pay in the absence of the combination and conspiracy, including paying more for personal computers and other products in which SRAM is a component as a result of higher prices paid for SRAM by the manufacturers of those products.

70.   Plaintiff and the class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

### (Violation of North Dakota Antitrust Law)

71.     Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as if fully set forth herein.

72.     During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed SRAM in North Dakota.

73.     During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, did the following to effect their conspiracy to fix, maintain or stabilize prices of SRAM sold and/or distributed in North Dakota, in violation of North Dakota Code § 51-08.1-01 *et seq.* :

  a.    Participated in meetings, conversations, and communications in the United States and elsewhere with competitors to discuss the prices of SRAM to be sold in North Dakota and the United States;

  b.    Agreed, during those meetings, conversations, and communications, to charge prices of SRAM at certain levels to be sold in North Dakota and the United States;

  c.    Issued price quotations in accordance with the agreements reached; and

  d.    Exchanged information on sales of SRAM to customers, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

74.     This horizontal price-fixing conspiracy restrained trade or commerce in North Dakota, and was designed to have, and did have, a substantial and adverse impact on prices for SRAM in North Dakota during the Class Period.

75.     As a result, Plaintiff and other members of the Class have sustained damages in an amount to be determined at trial.

## Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

76.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

77.     Defendants have been unjustly enriched through overpayments by Plaintiff and Class members and the resulting profits.

78.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiff and Class members.

79.     Plaintiff seeks disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff prays:**

1.     That the Court determine that the Sherman Act and North Dakota state antitrust law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

      a.     A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

6741

      b.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the North Dakota state antitrust laws as identified in the Second Claim for Relief herein;

      c.    Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

3.    That Plaintiff and the Class recover damages, as provided by federal and North Dakota state antitrust law, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

4.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner:  (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the sale of SRAM, information concerning bids of competitors;

5.    That Plaintiff be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

6.      That Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

7.      That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

8.      That Plaintiff and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.


Dated:  November 8, 2006                    Respectfully submitted,

                                            Michael S. Montgomery
                                            **Montgomery Goff & Bullis, P.C.**
                                            4802 Amber Valley Parkway
                                            PO Box 9199
                                            Fargo ND  58106-9199
                                            (701) 281-8001

                                            Daniel E. Gustafson
                                            Renae D. Steiner
                                            Jason S. Kilene
                                            **Gustafson Gluek PLLC**
                                            650 Northstar East
                                            608 Second Avenue South
                                            Minneapolis MN  55402
                                            (612) 333-8844

                                            Christine Pedigo Bartholomew
                                            **Finkelstein, Thompson & Loughran**
                                            601 Montgomery Street
                                            Suite 665
                                            San Francisco CA  94111
                                            (415) 398-8700

6741                                        25

L. Kendall Satterfield
Mila F. Bartos
**Finkelstein, Thompson & Loughran**
1050 30th Street NW
Washington, DC  20007
(202) 337-8000

*Attorneys for Plaintiff*